## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF VERMONT

| | |
|---|---|
| **TRAILSEDGE OWNERS ASSOCIATION, INC.,**<br>        **Plaintiff,**<br><br>        v.<br><br>**NED SKI ASSOCIATES, LLC, LAUDON ASSOCIATES, INC., ESTATE OF DONALD A. KLEPACKI, LAUREL G. KLEPACKI, JOSEPH KLEPACKI, and BLUE MOON DESIGN ARCHITECTURAL DESIGN, LLC**,<br>        **Defendants.** | **CIVIL ACTION NO.: 2:23-cv-00090-cr**<br><br>**JURY TRIAL REQUESTED** |

## <u>SECOND AMENDED COMPLAINT</u>

Plaintiff, Trailsedge Owners Association, Inc., by and through its attorney Leckerling Law, P.L.L.C., hereby complains against the Defendants as follows:

### *INTRODUCTION*

In this action, a homeowners' association seeks damages from those involved in the sponsorship, development, design, construction, and sale of the common interest community it governs for the latent defects and deficiencies discovered in the common elements and units of the community.

### *PARTIES, JURISDICTION, VENUE*

1)      Trailsedge Owners Association, Inc. (the "<u>Association</u>") is a non-profit corporation organized and existing pursuant to the laws of the State of Vermont.

2)      The Association is comprised of and represents all of the unit owners in Trailsedge on Mount Snow, a common interest ownership community located in Dover, Vermont

(the "Development") pursuant to the Condominium Declaration of Trailsedge on Mount Snow recorded in the Town of Dover land records, as amended (the "Declaration").

3)      Pursuant to the Declaration and the Vermont Common Interest Ownership Act, 27A V.S.A. (the "Act"), the Association has authority to bring this action.

4)      NED Ski Associates, LLC ("NED") is a foreign limited liability company with its principal place of business located at 146 West Main Street, New Britain, Connecticut.

5)      Laudon Associates, Inc. ("Laudon"), is a foreign corporation with a principal place of business located at 146 West Main Street, New Britain, Connecticut.

6)      Donald A. Klepacki died a resident of Connecticut on December 25, 2021.  Laurel G. Klepacki was duly appointed as the executrix of Donald A. Klepacki's estate by the State of Connecticut, Berlin County Probate Court on February 1, 2022.

7)      Laurel G. Klepacki is a resident of New Britain, Connecticut.

8)      Joseph Klepacki is a resident of Berlin, Connecticut.

9)      Blue Moon Design Architectural Design, LLC ("Blue Moon") is a foreign limited liability company with a principal place of business located at 168 Main Street, Terryville, Connecticut.

10)    The amount in controversy in this action exceeds $75,000.

11)    This Court has jurisdiction pursuant to 28 U.S.C. § 1332(a) as to all Counts and 28 U.S.C. § 1331 as to Count VII.

12)    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2).

## GENERAL ALLEGATIONS

13)    In 2011, NED, as the Declarant, recorded the Declaration and issued a Public Offering Statement for the Development.

14)     At all times relevant to this Complaint, Donald A. Klepacki was a managing member of NED, and a shareholder and director of Laudon.

15)     Laudon and Donald A. Klepacki were, together, the general contractors for the construction of the Development.

16)     Blue Moon designed the buildings in the Development, including but not limited to the roofs of the buildings.

17)     Upon information and belief, Joseph Klepacki was, at all times relevant to this Complaint, a member of NED and a shareholder and a director of Laudon, both during and after the construction of the Development.

18)     The Association administers, cares for, and is responsible for the maintenance, repair, and replacement of the common elements in the Development, as defined in the Declaration (the "Common Elements").

19)     From the date the Association was formed until October 2017, Donald A. Klepacki was a director of the Association appointed by NED as Declarant and served as the President of the Association.

20)     The Declaration, at Article 2, Section 2.19, provides that the Development may consist of twenty-nine (29) residential units in nine (9) buildings. The Development currently consists of 24 residential units in seven buildings (the "Buildings").

21)     The Declaration includes express and implied warranties including that each unit and the Common Elements meet the express and implied warranties set out in Sections 4-113 and 4-114 of the Act.

22)     In February 2011, NED, as Declarant, formed the Association and appointed its board of directors (the "Board").

23)     From creation of the Association until October 2017, NED appointed all members of the Board, including Donald A. Klepacki, Laurel G. Klepacki and Joseph Klepacki.

24)     At all times material, Donald A. Klepacki and Laurel G. Klepacki served as President and Secretary of the Association, respectively.

25)     At all times relevant to this Complaint, Laurel G. Klepacki was a member of NED and a shareholder and Director of Laudon.

26)     The Association was controlled by NED, Donald A. Klepacki, Laurel G. Klepacki, Joseph Klepacki and other persons designated by them, from its inception until October 2017.

27)     In October 2017, Donald A. Klepacki, Laurel G. Klepacki and Joseph Klepacki resigned as directors of the Association and NED turned over control of the Association to the unit owners.

28)     From the time of the recording of the Declaration, NED, as Declarant, developed and constructed buildings and condominium units for sale in the Development acting through and in concert with agents and affiliates, including Defendants Laudon, Donald A. Klepacki, Laurel G. Klepacki and Joseph Klepacki.

29)     In so acting, Defendants Donald A. Klepacki, Laurel G. Klepacki and Joseph Klepacki gave substantial assistance and encouragement to NED in their individual capacity and as directors of the Association, and as employees, officers, and directors of Laudon.

30)     Donald A. Klepacki made representations to the Association and its members concerning the Development in his individual capacity.

31)     Donald A. Klepacki made representations to the Association and its members in his capacity as officer and director of Laudon.

32)     At all relevant times, Laudon, directly or indirectly through its agents Donald A. Klepacki and Laurel G. Klepacki, provided labor, materials, and services to NED in connection with construction, maintenance, and repair of the Development.

33)     Upon information and belief, in connection with the Development, NED, as Declarant, acting through, and/or in concert with one or more of its agents and affiliates, including Laudon, Donald A. Klepacki and Laurel G. Klepacki, and their agents and employees, prepared and distributed a public offering statement (the "Public Offering Statement") and other documents marketing units in the Development to potential purchasers.

34)     The Declaration and Public Offering Statement include express and implied warranties, including that each unit and the Common Elements meet the express and implied warranties set out in Sections 4-113 and 4-114 of the Act.

35)     The Declaration and Public Offering Statement also made express representations concerning the materials to be used and quality of the construction of the Development including but not limited to:

> **4.2 Compliance With Permits.**  All materials and methodologies used in construction of the Units and Common Areas and Facilities in all Phases shall be in accordance with and subject to such restrictions as are imposed under applicable State and local land use and development permits.
>
> **4.3 Materials**. The buildings, Units and Common Areas and Facilities, shall be constructed using construction materials generally used for first-class new construction in the State of Vermont, including, without limitation, metal, masonry, wood, concrete and other construction materials and systems generally used for residential and commercial construction in the Dover, Vermont area.

36)     Beginning in 2010, Defendants NED, Laudon, Donald A. Klepacki and Laurel G. Klepacki (the "Developers and Builders") aggressively marketed the units in the Development

and made express representation about the quality of its construction, including but not limited to representations that:

> Donald Klepacki has been in real estate development for over thirty years. His commitment to superior construction and attention to detail, together with his personal involvement in each home has earned him a "hands on distinction" which sets him apart from most other developers. His goals not only include constructing quality homes, but ensuring the satisfaction and comfort of each and every homebuyer.

37)     The Developers and Builders' marketing materials for the Development included detailed construction specifications concerning the foundation, carpentry, siding, exterior trim, decking, interior trim, roofing, thermal and moisture protection, doors and windows, finishes, painting, fireplace, mechanical heating system, plumbing, electrical, ventilation, phone system, finish schedule for the flooring, plumbing fixture, countertops, prom wall floor, plumbing fixtures, countertops, kitchen cabinets and appliances, which were "subject to change" with substitutes "of better or equal quality."

38)     Beginning in 2010, the Developers and Builders began constructing the Development using designs provided by Blue Moon.

39)     The Development was built by the Developers and Builders and by subcontractors they hired.

40)     By providing such designs and undertaking such work, the Developers and Builders warranted and represented, expressly and impliedly, that the Development was designed, constructed, and sold to be suitable for residences, residential uses, habitable and free of all defects.

41)     Contrary to the Developers and Builders' warranties and representations, the Development does not comport with the warranties and representations they made about it.

42)     The design and construction of the walls, roofs, decks, faux chimneys, roads and stormwater infrastructure in the Development was deficient and failed to comply with accepted standards of construction, architectural design, and engineering practices.

43)     The Developers and Builders knew, or should have known, that their concerted acts and representations about the quality of the walls, roofs, decks, faux chimneys, roads, and stormwater infrastructure were false and were false when made, and nonetheless made such misrepresentations to induce third parties to purchase units in the Development.

44)     In reliance on the Developers and Builders' false representations, the members of the Association members did in fact purchase units in the Development.

45)     As a direct and proximate result of the Defendants' actions, the Common Elements and units were sold in the defective and deficient conditions set forth in this Complaint, which are unreasonably dangerous to owners thereof and to their property.

46)     The cause and existence of the defects and deficiencies set forth in this Complaint were known or should have been known to the Developers and Builders and Blue Moon, but were not readily recognizable by persons who lack special knowledge or training or were hidden building components or finishes, and are latent defects and deficiencies which the Association, in the exercise of reasonable diligence, did not earlier discover.

47)     As a direct and proximate result of Defendants' actions, the Buildings and infrastructure of the Development were sold in the defective and deficient conditions set forth in this Complaint, which are unreasonably dangerous to the unit owners and to their property.

**Defective Roof Design and Construction**

48)     The first four Buildings were certified for occupancy in 2011 and 2012.

49)    After the units in the first four Buildings were sold to members of the Association, ice dams began to occur periodically during the winter months on the building roofs, which caused leaks in some of the units.

50)    The Association, which was still controlled by the Declarant, asked the Developers and Builders and Blue Moon to resolve the ice dams and leaks.

51)    Defendants never suggested that the ice dams and leaks were due to their negligent design or construction of the roofs.

52)    Defendants, while they were in control of the Association, concealed and minimized the nature and extent of the deficiencies with the roofs and the costs they incurred to maintain them.

53)    In 2014, Defendants indicated that if the roofs were retrofitted with a rubber roof in certain areas (the "Fix"), the ice dams and leaks would be resolved.

54)    The Defendants, while they were still in control of the Association, designed, and installed the Fix on the roofs of the four existing Buildings.

55)    The Fix was also incorporated in the design and construction of the three other buildings which were certified for occupancy in 2015, 2017 and 2020, respectively.

56)    The design and construction of the Fix was negligent and failed to conform to accepted architectural and construction practices.

57)    During the winters of 2015 through 2017, the Fix seemed to abate the ice damming and leaks, and Donald Klepacki indicated that additional insulation, roof maintenance practices and heat tape would resolve any future ice dams and leaks.

58)    During the winter of 2018, the size and frequency of reported ice dams on the roofs and leaks increased for the first time since the Fix had been installed.

59)    In November of 2019, the Association obtained an independent engineering analysis to, among other things, to make an assessment of the roofs and discovered that the ice dams and leaks were caused by the Defendants' negligent design and construction of the roofs.

60)    The ice dams and leaks continue, causing damage to and limiting the use of other portions of the Buildings and infrastructure of the Development.

61)    The initial design and construction of all of the Buildings' roofs were negligent and failed to conform with accepted architectural and construction practices.

**Defective Exterior Wall Construction**

62)    In November of 2019, the Association also discovered latent defects in the design and construction of the exterior walls of Slalom Building 3 in the Development when the faux stonework on the exterior walls began to fall off.  The independent engineer engaged by the Association also examined the exterior walls of Slalom Building 3 and determined that the stonework was not properly installed in accordance with the manufacturer's guidelines.  In addition, the stones on the faux chimneys on the top of the roof of Slalom Building 3 began to fall off, creating a serious risk of potential damage to property and injury to people.  The Association shared the engineer's report with the Developers and Builders and demanded that they repair the work. On or about July 14, 2020, the Developers and Builders agreed to repair the defective exterior walls of Slalom Building 3.

63)    After commencing repair of the defective exterior walls of Slalom Building 3, the Developers and Builders abandoned the project and refused to complete it.

64)    As a result, costs of $73,939.20 were incurred to complete the repair of the exterior walls of Slalom Building 3.

65)    The faux chimneys on the top of the roof of Slalom Building 3, which the Association had removed, have still not been replaced.

66)    The defects in design and construction of the exterior walls has caused damage to and has limited the use of other portions of the Buildings and infrastructure of the Development.

## Additional Defects Throughout Development

67)    Following the discovery of the defects with the exteriors walls of Slalom Building 3, the Association had all of the Buildings in the Development inspected.

68)    The inspections identified defects with exterior walls, the decks, windows and doors, roofs, and fireplace chimneys in all of the Buildings in the Development.

69)    The inspections revealed that the roads in the Development were not constructed as required by the permits issued for the Development and as represented in the Declaration and Public Offering Statement.

70)    The inspections revealed that the stormwater infrastructure was not built in compliance with the permits issued for the Development and as represented in the Declaration and Public Offering Statement.

71)    These defects continue, causing damage to and limiting the use of other portions of the Buildings and infrastructure of the Development.

## Demand for Repair

72)    On September 9, 2022, the Association provided a detailed itemization of the defects in the Development and demanded that the Developers and Builders cure them or provide a plan to do so.

73)    The Developers and Builders have neither cured the defects nor provided a plan to do so.

74)     As a direct and proximate result of all of Defendants' actions and omissions, the Common Elements and units were sold in the defective and deficient conditions set forth in this Complaint and became unreasonably dangerous to owners thereof and to their property.

75)     The cause and existence of the defects and deficiencies set forth in this Complaint were known to Defendants and not readily recognizable by the Association and its members as persons who lack special knowledge or training in buildings and building components or finishes.

<u>*COUNT I – BREACH OF WARRANTIES*</u>

76)     Plaintiff repeats and realleges ¶¶ 1 through 75 and 83 through 147 as if fully set forth herein.

77)     Each Building in the Development, with the Common Elements appurtenant to it, was developed, designed, constructed, and sold to members of the Association by the Developers and Builders in the normal course of their businesses.

78)     Each unit, with its appurtenant interest in the Common Elements, was expected to and did in fact reach the present owner or owners thereof without their knowledge of the latent defects.

79)     In marketing and selling the units in the Development, the Builders and Developers expressly and impliedly warranted to the members of the Association that:

a.  the Buildings, including all materials and components used therein and all methods and manner of workmanship, were of merchantable and of first class quality, fit and proper for the uses for which they were designed, constructed, sold and used;

b.  the Buildings were free of all defects; and

c.  they could occupy the Buildings and the units therein.

80)     The Builders and Developers breached the aforesaid express and implied warranties in designing and constructing the Development in a manner that resulted in substandard conditions and defects and deficiencies in the Development, including, but not limited to:

    a.  Siding

        i.  Masonry – veneer installed in a manner inconsistent with manufacturer's instructions or industry standards and failed to protect the structural elements of the Buildings;

        ii.  Wood – absent or improper house wrap installation, flashing and sheathing causing extensive water damage, rotting and failed to protect the structural elements of the Buildings.

    b.  Decks

        i.  Concrete piers and footing not constructed in manner consistent with industry standards in Vermont;

        ii.  Missing and inconsistent framing;

        iii.  Failure to properly attach the decks to the building sides.

    c.  Windows and Doors

        i.  Absent or improper installation of house wrap, flashing, and sheathing causing extensive water damage and rotting and failed to protect the structural elements of the Buildings.

    d.  Roofs

        i.  Design and construction causing ice dams and leaking and allowed structural elements of the Buildings to be damaged.

    e.  Faux Chimneys

        i.  Faux chimney stonework on the roofs was not properly installed and is detaching causing a safety hazard from falling stones.

f.   Roads

i   The roads in the Development were not built in compliance with the permitting requirements and as represented in the Declaration and the Public Offering Statement.

g.   Stormwater Infrastructure

i.   The stormwater infrastructure was not built in compliance with the permitting requirements and as represented in the Declaration and the Public Offering Statement.

h.   Dumpster Area

i.   The Dumpster Area was not properly constructed and fenced as represented in the Declaration and the Public Offering Statement.

81)     In breaching their express and implied warranties, the Builders and Developers acted in concert.

82)     As a result of Developer and Builders' breach of express and implied warranties, the Association sustained damages and seeks the compensatory and punitive damages and the other relief prayed for below.

## COUNT II – NEGLIGENCE

83)     Plaintiff repeats and realleges ¶¶ 1 through 82 and 89 through 147 as if fully set forth herein.

84)     Defendants had a duty to comply to accepted standards of design, architectural, engineering and construction practices when they designed and constructed the Development and designed and installed the Fix.

85)     Defendants failed to comply with accepted standards of design, architectural, engineering and construction practices when they designed and constructed the Development and designed and installed the Fix.

86)     Defendants' negligence included, _inter alia_, constructing Buildings, with improperly designed and installed exterior walls, windows and doors, roofs, decks, and faux chimneys and deficient infrastructure including the stormwater, dumpster area, and roads for the Development.

87)     Defendants' negligent design, installation and construction of the walls, windows, doors, siding, roofs, decks, faux chimneys, roads and stormwater infrastructure in the Development caused, and continues to cause, damage, and limits the use of other part of the buildings and infrastructure.

88)     As a result of Defendants' negligence, the Association sustained damages and seeks compensatory and punitive damages, and the other relief prayed for below.

_COUNT III – BREACH OF FIDUCIARY DUTY_

89)     Plaintiff repeats and realleges ¶¶ 1 through 88 and 97 through 147 as if fully set forth herein.

90)     As members of the Association's Board and officers appointed by NED, Defendants Donald A. Klepacki, Lauren G. Klepacki and Joseph Klepacki had a duty to exercise the degree of care and loyalty required of a trustee in the performance of their duties.

91)     As directors and officers of Laudon, Defendants Donald A. Klepacki, Lauren G. Klepacki and Joseph Klepacki knew or should have known of the deficiencies in the design and construction of the Development set forth herein.

92)     Defendants Donald A. Klepacki, Lauren G. Klepacki and Joseph Klepacki breached their duties to the Association and its members by, _inter alia_,

     a.  failing to disclose the deficiencies in the design and construction of the Development as set forth herein;

b.  failing to cure the deficiencies in the design and construction of the Development as set forth herein; and

c.  failing to cause the election of non-declarant executive board members as required by the Declaration, the Bylaws and the Act.

93)  In breaching their duties to the Association and its members, Defendants Donald A. Klepacki, Laurel G. Klepacki, and Joseph Klepacki acted negligently, recklessly and/or intentionally.

94)  In breaching their duties to the Association and its members, Defendants Donald A. Klepacki, Laurel G. Klepacki, and Joseph Klepacki acted in concert with each other and with NED, and Laudon.

95)  Defendants' breaches of their duty to the Association and its members caused significant harm to the Association.

96)  As a result of Defendants Donald A. Klepacki, Laurel G.  Klepacki and Joseph Klepacki's breaches of fiduciary duty, the Association sustained damages and seeks compensatory and punitive damages from the Estate of Donald A. Klepacki, Laurel G.  Klepacki and Joseph Klepacki.

*COUNT IV – BREACH OF IMPLIED AND EXPRESSED CONTRACT*

97)  Plaintiff repeats and realleges ¶¶ 1 through 96 and 109 through 147 as if fully set forth herein.

98)  In marketing materials and orally, the Developers and Builders made contractual commitments to the Association and its members concerning the quality of the construction of the Development including its Common Elements and infrastructure.

99)     Upon information and belief, the Developers and Builders contracted with Blue Moon to provide professional architectural services, including designing Buildings in and appropriate for the Development.

100)    Blue Moon knew that the intended beneficiaries of its agreement to design the Buildings in the Development included the Association and its members.

101)    Blue Moon breached its agreement to design Buildings appropriate for the Development by, inter alia, failing to provide for the proper ventilation and drainage of the roofs.

102)    Blue Moon's breach of its agreement has caused and continues to cause ice dams to form and leaking into the Association's Buildings.

103)    In 2014, Blue Moon agreed to design a fix to prevent the ice damming on the roofs and leaking into the four completed buildings, and to incorporate that fix into the design and construction of the Buildings subsequently built.

104)    The Fix Blue Moon designed failed to prevent the ice damming and leaking into the Association's Buildings.

105)    The Developers and Builders and Blue Moon breached the aforesaid agreements.

106)    The Developers and Builders also failed to construct the Buildings and Common Elements and Infrastructure in accordance with the Public Offering Statement and the Permitting for the Development.

107)    The breaches of contract by Blue Moon and the Developers and Builders resulted in economic harm to the Association and its members, including but not limited to, loss of value in individual units, damage to all of the Buildings in the Development, and other compensable damages.

108)    As a result of Defendants' breaches, the Association sustained damages and seeks compensatory and punitive damages, and the other relief prayed for below.

*COUNT V – EQUITABLE ESTOPPEL*

109)    Plaintiff repeats and realleges ¶¶ 1 through 108 and 116 through 147 as if fully set forth herein.

110)    Prior to 2017, the Declarant, Developers and Builders and Blue Moon knew or should have known that the design and the construction of the Buildings, the infrastructure, and the Fix failed to comply with accepted standards of design and construction.

111)    In the end of 2017, when the executive board of the Association was first elected by unit owners who were not declarants, the Declarants, Developers and Builders had a duty to disclose that the design and construction of the Buildings, the infrastructure, and the Fix failed to comply with accepted standards of design and construction, but failed to do so.

112)    In failing to disclose that the Buildings, the infrastructure, and the Fix did not comply with accepted standards of design and construction, the Declarant, Developers and Builders and Blue Moon implicitly represented that they did so comply.

113)    The Declarant, Developers and Builders and Blue Moon knew that the Association would rely on their representations that the Buildings and the Fix complied with accepted standards of design and construction.

114)    The Association relied on the Declarant, Developers and Builders and Blue Moon's representation that the Buildings, the infrastructure and the Fix complied with accepted standards of design and construction.

115)    The Association relied on the Declarant, Developers and Builders and Blue Moon's failure to disclose that the Buildings, the infrastructure and the Fix did not comply with accepted standards of design and construction.

### COUNT VI - BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING

116)    Plaintiff repeats and realleges ¶¶ 1 through 115 and 121 through 147 as if fully set forth herein.

117)    The Builders and Developers had express and implied agreements with the Association and its members.

118)    Each such agreement contained an implied in law covenant of good faith and fair dealing.

119)    The Builders and Developers breached the covenant of good faith and fair dealing.

120)    As a proximate result of such breach the Association sustained damages and seeks the compensatory and punitive damages and the other relief prayed for below.

### COUNT VII - NEGLIGENT AND/OR INTENTIONAL MISREPRESENTATION

121)    Plaintiff repeats and realleges ¶¶ 1 through 120 and 128 through 147 as if fully set forth herein.

122)    The Developers and Builders, through their concerted acts, made intentional and/or negligent misrepresentations concerning the quality of construction in the Development.

123)    The Developers and Builders made such misrepresentations to induce members of the public to purchase units in the Development.

124)     The Developers and Builders knew and/or should have known at the time they made such representations that they were false and would be relied upon by the Association and its members.

125)     Members of the public purchased units in the Development in reliance on misrepresentations made by the Developers and Builders, and thereby became members of the Association responsible for the Common Elements.

126)     Reliance on these misrepresentations by the Association and its members caused damage to the Association and its members.

127)     As a result of Defendants' misrepresentations, the Association sustained damages and seeks compensatory and punitive damages, and the other relief prayed for below.

*COUNT VIII – VIOLATION OF CONSUMER PROTECTION ACTS*

128)     Plaintiff repeats and realleges ¶¶ 1 through 127 and 138 through 147 as if fully set forth herein.

129)     The Association and each of the unit owners is a consumer within the meaning of the Vermont Consumer Protection Act, 9 V.S.A. § 2451 et seq.

130)     The Association and each of the unit owners is a consumer within the meaning of the Federal Trade Commission Act, 15 U.S.C. § 45(a)(1) et seq.

131)     The Developers and Builders have furnished goods and services to and for the benefit of the Association and its members, within the meaning of the Vermont Consumer Protection Act and the Federal Trade Commission Act (the "Consumer Protection Acts").

132)     The Developers and Builders are sellers under the Consumer Protection Acts.

133)     The Developers and Builders' misrepresentations or practices as stated throughout this Complaint constitute unfair or deceptive practices.

134)     The Association and its members contracted for goods and services from the Defendants in reliance upon such misrepresentations or practices of the Defendants.

135)     The Association and its members substantially changed their economic position in reliance upon such misrepresentations or practices and suffered damage as a result.

136)     In engaging in such unfair or deceptive practices, Developers and Builders acted in concert.

137)     As a result of Defendants' unfair or deceptive acts or practices, the Association and its members sustained damages and seek compensatory damages, attorney's fees, and exemplary damages not exceeding three times the value of the consideration given, plus such appropriate equitable relief as this Court deems appropriate.

### COUNT IX:  VIOLATIONS OF ACT

138)     Plaintiff repeats and realleges ¶¶ 1 through 137 as if fully set forth herein.

139)     Upon information and belief, the Public Offering Statement was prepared in whole or in part by NED acting through and in concert with its agents and affiliates, including Laudon, Donald A. Klepacki and Laurel G. Klepacki.

140)     The Public Offering Statement included false or misleading statements and omissions of material fact as set forth herein, including but not limited to statements that each unit and the Common Elements meet the express and implied warranties set out in Sections 4-113 and 4-114 of the Act.

141)     The Public Offering Statement also falsely represented that the Development would be built in compliance with the permitting for the Development.

142)     Pursuant to Section 4-102 of the Act, NED and the Developers and Builders acting in concert with it are liable to the Association and its members under Section 4-117 of the Act for such false or misleading statements or omissions.

143)     The Act requires that at least one-fourth of the members of the executive board shall be elected by unit owners who are not declarants within 60 days after one-fourth of the created units is conveyed to owners other than a declarant.

144)     The Act requires that at least one-third of the executive board shall be elected by unit owners who are not declarants within 60 days after one-half of the created units is conveyed to unit owners other than declarants.

145)     NED, acting through and in concert with Laudon, Donald A. Klepacki, Laurel G. Klepacki and Joseph Klepacki, failed to cause the election of members of the executive board as required by the Act.

146)     In failing to cause the election of members of the executive board as required by the Act, such defendants exercised control over the Association in violation of the Act.

147)     As a result of Defendants' violations of the Act, the Association and its members sustained damages and seek compensatory and punitive damages, attorney's fees, and the other relief prayed for below.

## *PRAYER FOR RELIEF*

WHEREFORE, the Association demands compensatory and punitive damages against Defendants in an amount to be determined by the jury, including but not limited to attorney's fees, penalties prescribed pursuant to 9 V.S.A. § 2461 and such other relief as the Court deems just.

DATED at Stowe, Vermont this 15th day of April, 2024.

                                  **TRAILSEDGE OWNERS**
                                  **ASSOCIATION, INC.**

By:      /s/ ***E. William Leckerling***
                E. William Leckerling, Esq.
                LECKERLING LAW, PLLC
                998 South Main Street
                Suite 122
                Stowe, VT 05672
                (802) 865-2500
                wmleckerling@leck-law.com